63 P.3d 1089 (2003)
204 Ariz. 352
Helen H. LADEWIG
v.
ARIZONA DEPT. OF REVENUE
No. TX 1997-000075.
Tax Court of Arizona.
January 21, 2003.
*1090 Randall Wilkins, Paul Bonn, D. Michael Hall of Bonn & Wilkins Chartered, and Eugene O. Duffy of O'Neil, Cannon & Hollman, SC. for Plainiff.
Michael Kempner and Lisa Neuville, Assistant Attorneys General, for Defendant.

OPINION
PAUL A. KATZ, J.

Nature of the Case
In 1991, taxpayer Helen H. Ladewig ("Ladewig") filed an administrative refund claim with the Arizona Department of Revenue ("ADOR"), claiming that its denial of analogous deductions for dividends received from corporations not doing more than half their business in Arizona, i.e. former A.R.S. § 43-1052 (1992) (current version at A.R.S. § 43-1128 (1998)) was unconstitutional as a violation of the Commerce Clause. This Court will not reiterate the entire factual history of this case which is well stated by our Arizona Supreme Court in the special action taken in this matter, captioned Arizona Department of Revenue v. Dougherty, 200 Ariz. 515, 29 P.3d 862 (2001).
The remaining issue for this Court's determination is the reasonable amount of attorneys' fees and costs to be awarded to class counsel, Bonn & Wilkins, Chartered and O'Neil, Cannon & Hollman, S.C. (collectively "Class Counsel") from the $350 million common fund which was created by the efforts of Class Counsel in successfully litigating and settling the immediate case. Lead counsel from the Bonn & Wilkins firm, Paul Bonn, testified on December 19, 2002, that as of that date Class Counsel had invested approximately 11,564 hours of time in the litigation of this matter and had out-of-pocket costs in the amount of $1,053,448.00. This figure includes the approximate $800,000.00 that Class Counsel anticipates having to expend in the administration, processing and payment of claims. In reviewing the voluminous billing records of Class Counsel which were filed with this Court under seal, this Court concludes that they are somewhat duplicative. The records delineate work, particularly by the O'Neil firm, in which they assisted counsel in other state and United States Supreme Court matters. Although those other cases paved the way for the result in the immediate litigation, the work performed in those cases is not compensable hereunder. For the purpose of computing the reasonable attorneys' fees amount in this matter, this Court will allow 10,000 hours of Class Counsel's time as one of the bases upon which attorneys' fees will be calculated. The Court will accept the avowals and affidavits of counsel with respect to the costs incurred herein and reasonably anticipated to be incurred in the closure of this litigation.
As a final factual note, the Court observes that the parties have entered into a settlement agreement that has created a $350 million common fund from which the estimated 650,000 class members as well as attorneys' fees and costs will be paid. As part of the stipulated to settlement, the parties agree that they would not appeal an award of attorneys' fees between 9% and 12% of the common fund, the amount recommended by the mediator hired by the parties, Bruce E. Meyerson. Mr. Meyerson's recommendations are attached to Class Counsel's Motion for a Common Fund Attorneys' Fee Award *1091 and Request for Hearing which was filed with this Court on September 20, 2002.

Legal Discussion
This Court recognizes that it owes several duties when considering an award for attorneys' fees. The Court has a duty to ensure that fees stemming from common funds are reasonable under the circumstances of the particular case. In re Washington Pub. Power. Supply Sys. Sec. Litig., 19 F.3d 1291, 1296 (9th Cir.1994). The Court owes a duty to the attorneys to ensure they receive appropriate compensation for the reasonable value of their services performed for the benefit of the class members. City of Detroit v. Grinnell Corp., 560 F.2d 1093 (2nd Cir.1977). Lastly, the Court owes a duty to class members or beneficiaries to protect them from potential exploitation by attorneys seeking large fees at the expense of the class. Id. Courts have held that because the attorneys' relationship with their clients turns adversarial at the fee-setting stage, courts must assume the role of fiduciary for the class members. In re Washington, 19 F.3d at 1302. With these principles and duties in mind, this Court makes the following legal analysis.
The common fund doctrine is appropriate for application in this case. See, Kerr v. Killian, 197 Ariz. 213, 3 P.3d 1133 (App. 2000). Under this exception to the American Rule, the attorney who recovers a fund for the benefit of others is entitled to a reasonable fee to be paid from the fund as a whole. E.g., Boeing Co. v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). There is nothing in the common fund doctrine as adopted in Arizona, however, that suggests the application of this doctrine is to be without regard to the ultimate determination of a reasonable attorneys' fees to be awarded from the common fund.
The United States Court of Appeals for the Third Circuit, and many other courts have analyzed two basic methods for calculating attorneys' fees in this type of case. In In Re Prudential Ins. Co. America Sales Practices Litigation, 148 F.3d 283, 333 (3rd Cir. 1998), the court said,
There are two basic methods for calculating attorneys' feesthe percentage-of-recovery method and the lodestar method. [E]ach method has distinct advantages for certain kinds of actions which will make one of the methods more appropriate as a primary basis for determining the fee.... The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund `in a manner that rewards counsel for success and penalizes it for failure'.... The lodestar method is more commonly applied in the statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has small enough monetary value that a percentage-of-recovery method would provide inadequate compensation. It may also be applied in cases where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method. Although each of these methods is generally applied to certain types of cases, we have noted previously that "it is sensible for a court to use the second method of fee approval to cross check" its initial fee calculations.
Professor Charles Silver who was an expert witness for Class Counsel maintains that a percentage based formula, or market approach, harmonizes the interests of class counsel and absent Plaintiffs' better than time-based formulas like the lodestar approach. In Professor Silver's testimony, and in his Tulane Law Review article, Charles Silver, Due Process and the Lodestar Method: You Can't Get There From Here, 74 Tul. L.Rev. 1809 (2000), he further contends that,
[A]cademics, judges, and others who continue to support the lodestar method do so for reasons of legal ethics or professionalism, not because the lodestar minimizes principle-agent conflicts. This defense of the lodestar is fatally flawed, however, because the Due Process Clause trumps state bar rules. The option of using state bar rules to build avoidable conflicts into class actions is closed.
*1092 This Court is somewhat troubled by the trend in American courts in abandoning the lodestar method in favor of a percentage based formula as advocated by Professor Silver and Class Counsel. The Court disagrees with the viewpoint that the application of the lodestar method is fatally flawed and that the application of ethical rules, such as our own ER 1.5 tend to violate the due process rights of class members. The one thing that the percentage-based formulas do, is make the work of the judge easier. The judge is not compelled to scrutinize the billing rates of counsel, or what genuinely constitutes a reasonable and fair award of fees, taking into consideration such factors as counsel's actual investment of time in the case, the novelty and difficulty of the issues involved and the skill requisite to perform the legal services properly. This Court believes that the abandonment of the lodestar methodology in favor of a market approach which is largely founded in fiction, particularly in a novel case such as the one at bar, is inappropriate. Most class action cases, even those which result in a common fund recovery, usually involve an "evil" wrong-doer, or intentional tortfeasor who has willfully introduced unreasonably dangerous products into the stream of commerce, or committed a form of securities fraud. In these cases, there are usually seriously injured parties who are willing to maintain independent litigation or a significant number who are willing to be designated as class representatives, the legal issues are complex, and the need for fact intensive discovery great. In these cases, particularly when there are a group of plaintiffs who are ready, willing and able to negotiate an attorneys' fees agreement with class counsel, the market-based or percentage of recovery method would appear to be reasonable and appropriate.
Class actions in the tax arena are rare not only because of the risks assumed by counsel in the litigation of novel and often complex or obscure issues as suggested by class counsel, but because it is highly unlikely that state legislatures will pass blatantly unconstitutional statutes that will long withstand the passage of time.
The statute at issue in this case was promulgated by the Arizona legislature in 1979 and was based upon a statutory method of corporate dividend taxation which was approved by the United States Supreme Court in Colgate v. Harvey, 296 U.S. 404, 56 S.Ct. 252, 80 L.Ed. 299 (1935). While the Court cannot ignore the need to maintain an adequate incentive for counsel in cases similar to this one to be able and willing to take on big government when it wrongs the citizenry, this Court believes that there are and will remain very few circumstances in which cases of this nature will likely have to be maintained.[1]
This Court believes that applying the lodestar approach to the immediate situation is the most appropriate method for determining attorneys' fees. The Court would observe in passing that all lawyers have to offer to their clients and the community is their time and their skill. A lawyer's time is best measured by the hour, and his/her skill or ability is best measured by the hourly rate that he/she would be able to charge in our open market economy. The lodestar approach recognizes that the Court must come up with a multiplier to reward counsel who take on significant risk to vindicate the rights of their clients, particularly under circumstances where the issues are novel or complex, and the recovery is delayed for a number of years. While this Court could write a lengthy dissertation as regards the methodology to be applied, fortunately, it agrees with the conclusions of University of Chicago Law Professor William J. Lynk in his article, William J. Lynk, The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class-Action Litigation, 23 J. Legal Stud. 185, 189 (1994), in which he concludes that, "[n]o matter which method a court adopts, it must determine either (1) an appropriate multiplier for the lodestar, or (2) an appropriate percentage for the recovery." Essentially, whichever method is adopted by the Court, the results should be near the same.
*1093 This Court appreciates the novelty of the issues that were presented to counsel when they undertook this case in 1991. When Ladewig commenced her administrative claim and filed a 42 U.S.C. § 1983 Superior Court action, the Colgate, supra case was still good law. Present counsel in assuming this litigation, knew that it had an uphill battle to undertake with respect to convincing both the Arizona and, potentially, the United States Supreme Court that former A.R.S. § 43-1052 violated the Commerce Clause of the United States Constitution. Even if she could successfully do so, there were strong concerns that the state and federal courts would not make their holdings applicable retroactively, and accordingly, the only beneficiary of the litigation might be the Ladewig Estate or only those persons whose claims accrued after the Colgate line of cases were to be overruled. If a favorable decision were to not be applied retroactively, all of the efforts of counsel might have been rendered moot as the Arizona legislature had, for other reasons, effectively eliminated the discriminatory tax scheme by the tax year 1990.
However, by 1993, the United States Supreme Court in the case of Harper v. Virginia Department of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) had effectively determined that tax action judgments which declare state tax statutes to be violative of the Commerce Clause, are to be applied retroactively to the individual litigants and all members of the class. Additionally, by 1996, the United States Supreme Court in the case of Fulton Corporation v. Faulkner, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) had declared that tax schemes similar to the one in existence in Arizona were, in fact, violative of the Commerce Clause.
By the time the Ladewig litigation was actually filed in the Arizona Tax Court in 1997, the two primary substantive obstacles to Plaintiffs' recovery had already been resolved in the United States Supreme Court. While the O'Neil firm was involved either directly or in a consulting capacity in the handling of a number of state court and United States Supreme Court matters that cleared the road for Ladewig, Class Counsel is not entitled to any compensation for these efforts.
When the Ladewig litigation was originally filed with this Court, Plaintiffs still had three significant obstacles to overcome in obtaining class certification and a refund for all putative members of the class. The first of these obstacles was whether a class action tax refund lawsuit could be maintained in the State of Arizona. The two remaining issues were whether, as a prerequisite to participating in a class action asserting a claim for refund, each taxpayer was required to file an individual administrative refund claim with Arizona Department of Revenue, and whether Ladewig's filing of an administrative class claim in the administrative procedure tolled the statute of limitations for all putative class members. It is these latter three issues which were the primary focus of the Ladewig litigation from its 1997 inception until the ruling by our Supreme Court in Arizona Department of Revenue v. Dougherty, supra.
The traditional lodestar analysis parallels the factors that this Court is required to consider, pursuant to ER 1.5(a) in determining the reasonableness of attorneys' fees. This Court believes that it is being generous with Class Counsel in allowing 10,000 hours of billed time as the foundation for its lodestar analysis. There is no question that the dedication of Class Counsel in advocating the interest of the class was relentless and unyielding. At the time that the administrative claim was filed in this matter, both the substantive constitutional and class action certification issues were novel; the constitutional challenge would require the overturning of existing United States Supreme Court precedent and the class certification issues (including the exhaustion of administrative remedy issues) were wholly untested in Arizona. The novelty of these issues and the fact that the Tax Court and Arizona Supreme Court could well have declined to certify a class action for both public policy and failure to exhaust administrative remedy reasons, placed Class Counsel in the position of undertaking substantial risk. The quality of the attorneys representing the class was at all turns, outstanding.
*1094 Notwithstanding the diligence of Class Counsel and the novelty of the issues presented, this Court disagrees with Class Counsel's characterization of this case as complex. Factually, this case was quite simple as there were never any genuine issues of material fact in dispute. As the result of there being no contested factual issues, the parties were not required to engage in any significant discovery, which is frequently the "backbreaker" in complex class action litigation. While Class Counsel had to prepare itself for the anticipated risks that it was undertaking, many of which have been outlined in Exhibit 29 and during the testimony of Mr. Duffy, lead counsel from the O'Neil firm, many of the substantive constitutional issues had already been studied and briefed by Mr. Duffy, the O'Neil firm and other counsel with whom they had collaborated in key United State Supreme Court cases such as Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); Harper v. Virginia Department of Taxation, supra; Reich v. Collins, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994); and Fulton v. Faulkner, supra. While the tidewaters of the class action issues remained untested as of the time of the filing of this lawsuit, they were not complex. This Court is not minimizing the time invested by counsel in the processing of the administrative claim, the original section 1983 action and this lawsuit. The time invested in this case essentially involved the filing of a successful motion for summary judgment, the filing of appellate court briefs, and oral arguments before the Arizona Tax Court, Arizona Court of Appeals and Arizona Supreme Court. The majority of time spent in the eleven (11) years that this case has been pending has been spent in waiting while each of the respective courts involved in the processing of this case have attempted to administer justice.
The Court would also note that considerable time and effort was invested by Class Counsel in effectively negotiating a settlement that will result in the full refunding of illegally taxed dividend payments to the taxpayers who Class Counsel represent. Professor Silver, Professor Schneyer from the University of Arizona Law School, and former Superior Court Judge and practicing attorney, Gerald Strick, all testified that the recovery of 100% of a loss is extraordinary in class action matters. This Court whole-heartedly agrees, but is compelled to observe that it would expect nothing less than a 100% refund to be paid to citizens who had been wrongfully taxed by their government. This is often not the case in class actions where the tortfeasor is often bankrupt, in jail, or residing in a foreign country. The Court also notes that it was the collective effort of both Class Counsel and the Assistant Attorneys General assigned to the handling of this matter who are responsible for negotiating the very creative settlement obviating the need to process each and every taxpayers' putative claim on a claim-by-claim basis. This would have delayed the recovery to the taxpayers by at least five-fold and would have cost the State of Arizona substantially more money than the very reasonable and rational compromise that was reached in this matter.
The Court acknowledges that this case would not have been processed nearly as effectively or as quickly, had it not been for the high level of skill possessed by lead counsel for each of the respective law firms representing the class in these proceedings. There is, however, no competent evidence that the investment of time by either firm as a result of their undertakings in this case, cost either of the firms other significant business opportunities. On the other hand, the risk undertaken by counsel, the fact that they advanced approximately $246,815.00 in costs on behalf of the class, and the fact that their award of attorneys' fees has been delayed for almost twelve (12) years warrants that they be given a reasonable incentive for their efforts, and that other attorneys similarly situated would have an incentive to right the wrongs such as those presented in this litigation. As mentioned above, one of the reasons that this Court disfavors a percentage of recovery or market formula is that in doing so, this Judge would have to become a "Monday morning quarterback." At the time that this litigation was first contemplated, there was no market context into which it can reasonably be placed. The *1095 United States Supreme Court in its 1935 Colgate, supra, decision validated the type of tax scheme in effect in Arizona since 1989, wherein in-state corporate dividends could be exempted from taxation, while taxing out-of-state corporate dividends at a prescribed rate. As a result, not a single lawyer, CPA (accountant), corporate executive, law professor or taxpayer ever filed an administrative claim seeking a refund on the grounds that this statute violated the Commerce Clause; this is true both in the years before and after Ladewig filed her claim.
As noted, this is not a typical class action lawsuit where there are a number of injured victims who have suffered severe personal injury or financial loss at the hands of an unscrupulous wrongdoer. The taxpayer victims in this case did not perceive themselves as having been harmed, and the ultimate result of this litigation was not to vindicate the rights of taxpayers as much as it was to free out-of-state corporations who are not represented in these proceedings, from the burden of having their dividends paid to stockholders, taxed at a higher rate than that of in-state Arizona corporations. The net effect is not to free taxpayers from an unfair tax burden, but is to allow corporations, both in and out of state, to freely to compete for the monies of potential stockholders. It is also naïve to believe that this case was undertaken by the Bonn and O'Neil law firms out of a sense of altruism or dedication to Arizona taxpayers. These excellent lawyers perceived a potential flaw in Arizona tax law and undertook the risk in this case primarily as the result of a perceived long-shot benefit to themselves. On the other hand, but for the efforts of counsel, the class today would receive nothing.
Professor Silver tells us in conducting a market approach to fees, we should disregard the final result and look to see what a reasonable group of taxpayers would have been willing to pay their lawyers in 1991 to pursue this action on their behalf. Then in the same breath, he suggests that we look at the fantastic result obtained by counsel and take that into consideration in determining what percentage of recovery would be a reasonable fee. The inconsistency in these two positions is impossible to resolve. As previously indicated, in 1991, there was no group of citizens, corporate executives, CPAs or college professors willing to engage the services of any lawyer or law firm to pursue this litigation, save Helen Ladewig and her counsel. Since this case does not involve typical class action type of injury, and there was not a class of individuals who were ready, willing and able to negotiate a contract for representation in 1991, the market approach in awarding attorneys' fees has little validity when placed in the context of reality.
In Vizcaino v. Microsoft Corporation, 290 F.3d 1043 (9th Cir.2002), the Ninth Circuit Court of Appeals approved a fee of up to 28% of the settlement fund with a lodestar multiplier 3.65. The Court, in an opinion written by a highly experienced District Court judge and concurred in by an Appellate judge with extensive private and public litigation experience, expressed the importance of the lodestar test as follows:
Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award. Where such investment is minimal... the lodestar calculation may convince a court that a lower percentage is reasonable. Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted. Thus, while the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award.
Vizcaino v. Microsoft Corporation, 290 F.3d at 1050.
This Court in taking judicial notice of Judge Burke's attorneys' fees decision rendered in the Baptist Foundation of Arizona v. Arthur Andersen, LLP, et al., Maricopa County Superior Court cause number CV 99-019093 consolidated with civil cause number CV 2000-015849, would note that Judge Burke recently awarded lead counsel $35 million in fees resulting in a lodestar multiplier of 3.11 or a total of 14.7% of the $238 million common fund recovery. This Court would note, however, in that case that Class Counsel *1096 invested 35,000 hours of time in a case that involved substantial and costly discovery. In this case, the Court believes that in light of the lengthy delay in recovery, and the high risks assumed by counsel, that a lodestar multiplier of 6 is appropriate. The Court will apply an average hourly rate for Class Counsel's efforts of $250.00 per hour and multiply it by the lodestar factor, resulting in an hourly fee of $1,500.00 per hour. This fee multiplied by the 10,000 hours reasonably invested by counsel in this case results in attorneys' fees to be awarded in an amount of $15 million. To this amount, the Court will award to counsel costs incurred to date and reasonably contemplated to be incurred in the future in the amount of $1,061,815.00 for a total of award of attorneys' fees and costs in the amount of $16,061,815.00, or 4.58% of the total fund recovery. Although this is a lower recovery from a percentage perspective than was awarded in Baptist Foundation v. Andersen, supra, it is a case in which the investment of time by counsel is approximately 1/3 of the time invested by Andersen's counsel, also under circumstances of great risk.[2] However, this Court is awarding current Class Counsel attorneys' fees using a lodestar factor almost twice that used by Judge Burke in Andersen because it recognizes the novelty of the legal issues involved and the long delay in recovery. As a final note, this Court would observe that while the taxpayers in the immediate class would have recovered nothing but for the ingenuity and diligence of Class Counsel, the fund having in it $350 million is a matter of fortuity, i.e., the fact that there are approximately 650,000 members of the class. As noted by Bruce Meyerson in paragraph 3 of his recommendation to this Court,
Although Class Counsel is undoubtedly correct that individual members of the class might happily pay 25% or even more of their recovery as an attorneys' fees in case, in matters with extraordinarily large funds, courts commonly use lower percentages so that the fee is not "unreasonably large for the benefits conferred." In re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465, 486 (S.D.N.Y.1998).
In making this award of attorneys' fees, this Court strikes a balance in the exercise of its fiduciary responsibilities to make sure that Class Counsel is fairly and reasonably compensated, while also ensuring that the members of the class receive a maximum return on their respective losses.

ORDER
NOW, THEREFORE,
IT IS ORDERED awarding Class Counsel their costs and reasonable attorneys' fees in the amount of $16,061,815.00.
NOTES
[1] In most instances in which the government passes blatantly unconstitutional litigation, the issues to be presented to the Court are seldom novel or complex, unlike the case at bar. Additionally, the validity of such statutes would likely be contested within relatively short-order.
[2] This Court is independently aware of the efforts invested by class counsel in Baptist Foundation v. Andersen, by virtue of the fact that this Judge has decided all matters in civil cause number CV 99-019093 with the exception of the attorneys' fees issue which was consolidated before Judge Burke as part of a combined settlement.